CONOVER'S ADMINISTRATOR

v.

BROWN'S EXECUTORS.

A father made his promissory note for $1,000 in favor of his daughter A, closing with these words, "Witness my hand and seal," signed it, caused it to be witnessed by a neighbor, but did not, so far as appeared, place upon it any seal or scroll, or device in place of a seal, and delivered it in escrow for his said daughter. He made similar provisions for four other daughters, which latter were recognized by his executors, and paid or satisfied. The daughter A survived her father, and, having died intestate, her husband, as administrator, demanded the amount due upon the note.—*Held*, that the consideration of love, affection and parental duty was sufficient to authorize a court of equity to supply the seal and enforce the note against the executors of the maker.

On final hearing on pleadings and proofs.

*Mr. Alan H. Strong*, for the complainant.

*Mr. Alvah A. Clark*, for the defendants.

PITNEY, V. C.

The bill was originally filed by Peter V. Conover, as administrator of his wife, Anne E. Conover, deceased, against James Brown and Stephen Brown, executors of Stephen Brown, deceased.

The subjects of the contest are a bond and mortgage and two certain promissory notes, viz., (1) a bond and mortgage dated September 6th, 1879, made by the complainant, Peter V. Conover, and his wife to the testator, Stephen Brown, to secure the

payment of $2,210.84 in one year, with interest, and covering the farm of said Conover, situate in Middlesex county; (2) a promissory note dated September 6th, 1879, made by Stephen Brown to Anne E. Conover, for $1,034.10, payable in one year, with interest; and (3) a promissory note made by Stephen Brown to the order of Anne E. Conover, for $1,000, dated September 20th, 1880, at six months, with interest.

After the defendants had answered and the cause was at issue and part of the testimony had been taken, the complainant, Peter V. Conover, died intestate, and letters of administration *de bonis non* upon Anne E. Conover's estate, and also letters of administration upon the estate of Peter V. Conover, were issued to Abner S. Coriell.

Peter V. Conover left four children, who were his next of kin and heirs at law, and three of them made conveyances and assignments to George R. Conover, another of his children, of all their interest in the real and personal estate of which said Peter died seized or possessed; and upon these facts being presented to the court, by a petition, Abner S. Coriell, in his double capacity of administrator of both Anne E. and Peter V. Conover, and the said George R. Conover were admitted parties complainant.

The bill alleges that the bond and mortgage were held by Stephen Brown in his lifetime, in trust for Anne E. Conover, and that upon her death the equitable title thereto vested in her administrator, and that the two promissory notes being made directly to her also vested in her administrator, and that the said notes and mortgage are withheld by the executors of Stephen Brown, and prays that they may be delivered to the complainant, or that the executors may account to the complainant for the amount due on the promissory notes and for other relief.

The real nature of the controversy will best appear by a brief statement of the facts.

Stephen Brown, the defendants' testator, was a farmer and a man of some means, living near Bound Brook, in Somerset county. He had seven children—five daughters and two sons—all unmarried, living at home, except Anne, who married Peter

V. Conover, and Carrie, who married one Hart, and lived in the same neighborhood.

Peter V. Conover was a farmer, living in Middlesex county, about four miles from Bound Brook, and owned a farm there covered by the mortgage in question. He was a widower with four children, and married Anne Brown in the year 1871. She had no children.

On the 6th of September, 1879, a suit was pending against Peter V. Conover on a guardian's bond, which he had signed as surety for one Smalley, and, being somewhat indebted to his wife, Anne Conover, and to her father, Stephen Brown, and to some others, he desired to secure them in preference to any judgment that might be recovered against him on the bond. The indebtedness to his wife consisted of two promissory notes, one for $500 and the other for $350, and they amounted on that day, with interest, to $1,034.10. The indebtedness to his father-in-law, Stephen Brown, consisted of two notes, one for $600 and one for $500, and they, with the arrears of interest thereon, together with the amount due on the two notes held by his wife, amounted to nearly or quite $2,210.84, the amount of the mortgage now in controversy. On that day he went to the office of R. V. Lindabury, counselor-at-law, at Bound Brook, and stated the situation to him, with the result that the bond and mortgage in question were prepared, and on that day, which was Saturday, or the next Monday, they were executed. The amount due his wife was inserted upon the idea that her father could hold the mortgage in trust for her to that extent, and that some arrangement could be made between her and her father by which her interest in the mortgage would be manifested. The mortgage being executed and delivered, the father, Stephen Brown, made and delivered to his daughter, Anne Conover, the promissory note of $1,034.10 before mentioned, but the making of that note was entirely unknown to Peter V. Conover. Possession of the note was retained by Anne Conover for a year or two, and then it was taken by her and left at her father's house, either in his custody, or, as the Browns contend and swear, in the custody of her mother. A year afterwards, on the 20th of September,

Stephen Brown made the second note above mentioned for $1,000 to Anne Conover, which, after his death and after the death of Anne Conover, was found pinned with the note of $1,034.10, in the possession of some one of the Brown family. The origin and consideration of this $1,000 note will be referred to hereafter. Its existence, as well as that of the $1,034 note, was unknown to Peter V. Conover until after his wife's death.

Stephen Brown died in July, 1882, testate of a will, by which he appointed his two sons, James and Stephen, executors. The business of managing the estate devolved principally upon James, but as he and his brother and three of his sisters all lived together in the homestead, they were all more or less familiar with all the details of its management, and it is manifest from the evidence that the elder sister (Sarah) was a person of more intelligence than either of her brothers, and of a masterful mind and disposition.

Peter V. Conover paid a portion of the interest on his mortgage from time to time during his wife's lifetime. On one occasion, as he swears, and I believe him, and it is not contradicted, during her lifetime, but after Stephen Brown's death, he called on James Brown to pay the interest on the $2,210.84 mortgage and some other mortgages which Stephen Brown then held on his farm, but which others have since been paid and satisfied, and have no bearing upon the present controversy, and James Brown declined to take the interest on the $2,210 mortgage, for the reason, as he said, that it now belonged to Conover's wife, the executors having assigned and transferred it to her, and that he (Conover) need not count that as one of the securities upon which he would thereafter be obliged to pay interest.

This being the situation of affairs, and Conover and his family being entirely ignorant of the existence of the two promissory notes, his wife Anne died November 18th, 1886. The note of $1,034.10 matured on the 9th of September, 1880, and but for the death of Stephen Brown would have been barred by the statute of limitations on the 9th day of September, 1886, but his death prolonged the running of the statute for six additional

months, so that at the death of Anne Conover it had nearly four
months to run before being barred.

Peter V. Conover immediately took out letters of administra-
tion upon his wife's estate, and swears that after her death he
saw James Brown about the bond and mortgage, and that he
asked for those papers and the assignment to his wife, and that
Brown said that he had done making assignments to Anne and
that her money would have to go back into the estate; he fur-
ther told Mr. Conover that although the executors had made an
assignment of the bond and mortgage to Anne, she had not
accepted it.   Mr. Conover then asked Brown to allow upon the
mortgage the amount which he had put into it for his wife, viz.,
the $1,034.10, and Brown declined to do it, and said he must
see his lawyer, Mr. Clark, first.

Subsequently, on the 25th of December, 1886, a month after
his wife's death, he went with his son, George Conover, to the
Brown homestead and there saw James and Stephen Brown, the
executors, and Sarah and Julia Brown, their sisters.   The
mother of these persons was still alive, but an invalid, confined
to her room.

The parties vary considerably as to the occurrences at that
interview.   The Conovers supposed that the bond and mortgage
had been handed to Mrs. Conover, but that the assignment was
suppressed, and knew nothing about the existence of the notes,
and they inquired after and demanded her estate, claiming that
she had money and property which was in the possession of the
Browns.   Thereupon Sarah Brown, on the command of her
brother James, went upstairs and brought down a bond and
mortgage for $700, executed by one McCord to Anne E. Con-
over, and handed that to Peter V. Conover.

Peter V. Conover's account of what followed is this:

.  "James said, 'Sally, go and fetch those notes down.'   She went and fetched
one down.   Sally said that her father had given each of the girls a note.
Here James said, 'Bring the other one down.'   James said, 'Sally, I think
we ought to allow Mr. Conover one of those notes.'   Sally said, 'If you do
you will pay it out of your own pocket; I will law the whole estate away
before he shall have a single dollar.'

"*Q.* What was done with the notes then?

"*A.* Sally took them off the table and went away out of the room with them."

## George Conover's account is this:

"I asked James if these were all the papers he had of Anne; he said, 'Yes;' father said, 'You told me some time ago that you had assigned this $2,210.84 mortgage over to Anne;' he said he had, but she did not accept of it; then I asked him what he had to say about Anne's part of the $2,210.84 mortgage; his answer was, he did not think we ought to be hard on him, as they had befriended father when he was in trouble; I replied I did not think he would lose any money by that; I then asked him over again what he had to say about the part belonging to Anne; he then said she had no money in it; I asked him, then where was her money; he then told Sarah' Brown to go and get Anne's notes; she went out and brought in a $1,000 note, payable to Anne E. Conover, signed by Stephen Brown; Sarah said that her father gave each one of the girls such a note; according to the terms of the will, the money not being paid, the money would have to go back to father's estate; then James told her to go and get the other note of Anne's; James said to Sarah that they had ought to allow that note.

"*Q.* What note did he refer to?

"*A.* The last one that Sarah brought out.

"*Q.* Then she had brought a second note?

"*A.* Yes, sir; Sarah, in reply, said she would law the whole estate away first before they would pay a single dollar, and picked up both notes and went out; while out I asked James if he meant to let us have either one of those notes to take along; he said, 'No.'

"*Q.* Was there any further conversation about the notes, or about the $2,210.84 mortgage?

"*A.* Nothing more than I told him he had better come down to see us and not have any trouble about it; he said he would.

"*Q.* Did he ever do so?

"*A.* No, sir.

"*Q.* Did any person, on that occasion, or ever, as far as you know, offer to allow your father to take either of the notes which were then produced?

"*A.* Not that I know of.

"*Q.* Were you present at the entire conversation at the house of Stephen Brown?

"*A.* I was at that time.

"*Q.* Was it signified to your father by any of the Browns at that time that he might take either of those notes?

"*A.* No, sir.

"*Q.* Was anything said then by anybody as to the notes, or either of them, being outlawed?

Conover *v.* Brown.

"*A.* Not mentioned on either side.

"*Q.* Did either you or your father, at that time, decline to receive either of the notes?

"*A.* No. sir."


James Brown was sworn, but his evidence, owing to mental failure, is unreliable.

Stephen Brown's account of it is as follows:

"*A.* George and Mr. Conover came in, and he asked for the papers and wanted a settlement of all the interest on the mortgages.

"*Q.* Mortgages that you held against him?

"*A.* Yes, sir.

"*Q.* They were in the safe, were they not?

"*A.* Yes, sir.

"*Q.* And you told Sarah to go and get the note?

"*A.* To go and get the note.

"*Q.* What note?

"*A.* The $1,034 note.

"*Q.* And was that brought there?

"*A.* Yes, sir.

"*Q.* Did she bring in both notes, or only one?

"*A.* Two, pinned together.

"*Q.* She brought them both in at one time?

"*A.* Yes, sir.

"*Q.* But she hadn't been sent to get any but the $1,034 note?

"*A.* That was all.

"*Q.* What was your purpose in sending her for that note?

"*A.* That was the original note given to Mrs. Conover; the two notes that she held were put in the mortgage.

"*Q.* Why was that $1,034 note produced?

"*A.* It was produced for Mr. Conover.

"*Q.* Was it given to him?

"*A.* Yes, sir.

"*Q.* The $1,034 note?

"*A.* Yes, sir.

"*Q.* What did he do with it?

"*A.* Looked it over; took the date down.

"*Q.* Did he take it away with him?

"*A.* No, sir.

"*Q.* Why not?

"*A.* He didn't want it.

"*Q.* Did you offer it to him?

"*A.* Yes, sir; he said it was outlawed.

"*Q.* He said it was outlawed?

"*A.* Yes, sir.

Conover v. Brown.

"*Q.* That was the understanding of yourself and Mr. Conover at that time?
"*A.* Yes, sir.
"*Q.* For that reason he refused to take it?
"*A.* Yes, sir.
"*Q.* Did you offer it to him?
"*A.* No, sir.
"*Q.* Were you willing to pay it to him?
"*A.* No, sir.
"*Q.* Or allow it to him?
"*A.* No, sir; couldn't do that, not after it was outlawed, unless I took it out of my own pocket.
"*Q.* You told Mr. Conover that—you told him that the note couldn't be paid to him because it was outlawed?
"*A.* Yes, sir.
"*Q.* And then he refused to take it?
"*A.* Yes, sir.
"*Q.* Did you tell him he couldn't be allowed that note on account of this mortgage?
"*A.* Yes, sir.
"*Q.* You told him that?
"*A.* Yes, sir.
"*Q.* That you could not recognize the note in any way because it was outlawed?
"*A.* Yes, sir.
"*Q.* At that conversation after your sister's death, and when Peter Conover came there with his son George, and these notes were produced, I think you said that was the first time that you knew that Peter Conover denied owing the whole of that mortgage.
"*A.* That was the first time.
"*Q.* He denied, then, owing the whole mortgage?
"*A.* Yes, sir.
"*Q.* And he claimed that this $1,034 note should be allowed him on that mortgage?
"*A.* That was what he wanted.
"*Q.* And you and your brother refused to allow that, for the reason that you said the note was outlawed?
"*A.* Yes, sir."

I stop here to remark that it is quite plain that the Browns did not intend, if they could avoid it, to produce to the Conovers any securities as belonging to Anne Conover except the McCord mortgage, and were driven to produce the $1,034 note to meet the Conovers' allegation, which they could not deny, that Conover's debt to his wife, to that extent, had been included in

the mortgage, and the $1,000 note was pinned fast to the $1,034 note.

The point in which the witnesses differ as to the occurrences of this interview is as to whether or not the Browns were willing that the Conovers should take away the two notes as the property of Anne Conover, the Browns alleging that they were willing the Conovers should take the note for $1,034, but not the note for $1,000, and the Conovers insisting that they were refused permission to take either of the notes.

Sarah Brown was called by the complainant. While she denies that her brother James suggested that the Browns ought to allow the Conovers one of the notes, and swears most positively that the Browns offered to the Conovers the $1,034 note, she swears that she was unwilling that her brothers, the executors, should pay that note to the Browns or allow it against the mortgage. She said that the reasons why she was unwilling were —first, because the note was outlawed, and, second, because her sister had expressed her desire that her property at her death should go to her brothers and sisters, or, as she expressed it, that the $1,034 note "should go back into the estate."

All parties seem to have overlooked the six months extension of the bar of the statute caused by the death of Stephen Brown.

Julia Brown denies that her sister Sarah said that "she would law the whole estate away before Conover should have a single dollar," but says that the Conovers said that *they* would go to law, and when asked what they said about the $1,034 note, the note that was outlawed, she said, "They would go to law about that note;" and when asked, "Why should they go to law for that note?" she answered, "It was outlawed, and my sister didn't wish it paid; my sister [Anne Conover] wanted her own folks to have that money;" and when asked whether Conover did not want to have the $1,034 note allowed on the mortgage, she said that she did not remember; and when asked whether she was willing, on the day of that interview, that the $1,034 note should be credited on the mortgage, she answered, "No, sir; because she [meaning Mrs. Conover] said it should go to her brothers and sisters."

From a careful review of all the evidence, I am satisfied that the Conovers did, in effect, demand that the note for $1,034.10 should be credited on the mortgage, and that that demand was refused by the Browns; and I am inclined to believe that the Browns were unwilling and did, in effect, refuse to allow the Conovers to take possession of that note, as well as the $1,000 note, or, at least, that the Conovers were warranted in so understanding their words and conduct. It is certain that the two notes were taken up from the table by Sarah and removed from the room before the interview closed.

With regard to the $1,000 note, the evidence of the Browns is to the effect that Stephen Brown, being desirous of giving each of his daughters $1,000, made his note for that amount to each of them, and that the note now in question was made for that purpose, and was delivered to the mother in escrow for Anne, upon condition that if Anne Conover, when she discovered, after the death of her father, that he had given $1,000 to each of her sisters, found fault with such disposition, then the note was to be delivered to her, upon the further condition that she would transfer to her father's executors the McCord mortgage for $700. They deny that Mrs. Conover ever knew of the existence of this note, but both Sarah and Julia inadvertently admitted on the stand that she did know it. The note is in the handwriting of Stephen Brown, and is executed in this way : " Witness my hand and seal this 20th day of September, 1880," signed "Stephen Brown," and witnessed by "A. Cammon " (an elderly gentleman who was entirely disabled, mentally and physically, at the time of the taking of the testimony herein), but there is no appearance of any scroll having been made or seal impressed upon it. There is no reliable evidence that the note has any other consideration or value except that just stated. The reason given by the Browns for the condition being imposed by their father that Anne, before receiving the note, should transfer to the executors the McCord mortgage, is this : that the money for the McCord mortgage was advanced by Stephen Brown out of his own funds as an outset to Anne. Now, Anne was married in 1871, and the McCord mortgage was dated on

the 9th of July, 1877, six years after her marriage.   No note·
was given to either of the other sisters at or about the date of
the $1,000 note, and the sample of those given, produced, is an·
order dated 20th of September, 1878, two years prior to Anne·
Conover's note, signed by Stephen Brown, by which he directed·
his executors to—

"pay to Letitia Brown or her order, six months after my death, one thousand
dollars, without defalcation or discount, for value received, witness my hand·
and seal this 20th day of September, 1878."

The Conovers deny that the money for the McCord mortgage
was advanced by Stephen Brown out of his own funds, and they
prove that Anne Conover kept an account in a savings bank
in New Brunswick—one in her name as a single woman before
her marriage, and one after her marriage in her name as Con--
over; that she was a very saving, economical woman; that
before her marriage to her husband she lived with her grand-
father, Smock, and while with him she saved money from eggs·
and poultry and deposited the same in the savings bank, and
after her marriage she also had the proceeds of the eggs and·
poultry on her husband's farm and deposited that in bank, and·
that on the 9th of July, 1877, the very date of the McCord
mortgage, she drew from the bank $560, being $140 less than·
the amount of the mortgage.   This concurrence of dates, and
other circumstances in the case, lead me to· believe that this story
sworn to by the Browns that their father had advanced this $700·
to McCord on this mortgage out of his own money, and had
made a present of it to Anne Conover, was a sheer fabrication.
They swear to the very improbable story that he had ·given to·
Mrs. Hart a like amount of $700 in money and furniture upon
her marriage, and that her note of $1,000 was also conditioned
upon the return of that money and furniture, and that she·
actually did return it after her father's death and before she·
received her $1,000; but Mrs. Hart was not sworn in support
of it, nor was any reason assigned for her not being sworn, and·
her husband was sworn and was silent on the subject.

This conclusion that the money, for which the McCord mort-gage was given, was advanced by Mrs. Conover and not by her father, is not inconsistent with the fact that he did with his own hand pay the money to McCord and get the mortgage, and that the business was transacted at his house, since there is evidence to show that Mrs. Conover did her business of that sort, to a greater or less extent, through her father, and that he had money of her's in hand at various times.

The result at which I arrive with regard to the value of the evidence of the Browns touching the McCord.mortgage, and the alleged condition upon which the $1,000 note was given by the father to Anne E. Conover, while it leads me to put little or no confidence in the evidence of Sarah and Julia Brown, still leaves the note without any moneyed consideration, or any consideration except that of a gift from a father to a daughter, made for the purpose of equalizing her with his other daughters.

I have no difficulty upon the question of delivery. When the $1,000 note was produced, it was pinned to the $1,034 note, which was clearly the property of Anne Conover and deposited by her with her mother for safe keeping. The fair inference is that the $1,000 note was also delivered to Anne and placed with her other papers for safe keeping.

Turning now to the consideration of the grounds of complainant's claim to the several subjects of contest. The complainant claims title to the mortgage under the assignment which he contends was executed by the executors of Brown in the lifetime of Mrs. Conover. I am satisfied that such an assignment was executed, but the same evidence which proves its execution also proves that it was not accepted by Mrs. Conover, and such acceptance is necessary in order to vest the title in it in her. That part of the contention, therefore, fails, but the fact that the executors were willing to make it should not be overlooked in the further consideration of the case.

Complainant's next point is that he is interested in this mortgage to the extent of the note for $1,034, by virtue of a trust which resulted to Mrs. Conover at the time of its execution. I think the facts fully establish that such a trust did result, or

would have resulted, from the bare fact that the amount of Mrs. Conover's notes against her husband were made part of the consideration of the mortgage. But the mortgagee gave a note to Mrs. Conover for the amount of her interest in it, and the question is whether or not the giving and acceptance of that note was not an execution and discharge of the trust, which left Mrs. Conover the right to look only to the personal responsibility of Mr. Brown, her father, for the amount.

An argument of much force was addressed to me in favor of the position that the mere giving of a promissory note, under the circumstances, would not discharge the trust. But I find it unnecessary to decide that question since I have come to the conclusion, as before stated, that the evidence thoroughly establishes the fact that prior to or on the Christmas Day of 1886, before the note for $1,034 was barred by the statute, Peter V. Conover did demand that the amount of that note should be offset against the mortgage which he owed the estate, and that such demand was refused. Now, I think that such offset was precisely what he was entitled to. It was a proper and just application to be made of the note. He owed the estate the mortgage for $2,210.84, and the estate owed him, as administrator of his wife, the amount of the note in question, and it would have been idle for him to have demanded the note itself and sued upon it in order to get the money to apply it on the mortgage. Besides, the circumstances of the case made it peculiarly proper that it should be so applied.

I come without difficulty to the conclusion that the complainant is entitled to relief to that extent, viz., to have the amount of the note for $1,034, with interest from its date, applied toward the payment of his mortgage.

It was suggested that the note was not in the possession and control of the executors, but was in the possession of the mother, who is since deceased, but it is quite manifest from the evidence that the whole estate was practically within the control of the executors. Be that as it may, at the interview in question both the notes were on the table, for a time at least, and entirely in

ithe power of the parties there present to have then and there applied them on the mortgage.

This leaves for consideration only the right of the complainant to the $1,000 note witnessed by Cammon. The defendants admit that the complainant was refused possession and control of that note on the Christmas Day meeting, and I think that the executors are responsible for the result of that meeting. If the note was a valid security, complainant was entitled to the same remedy of set-off with regard to that as with regard to the note for $1,034, and though he may not have demanded it with so much precision as he did in the case of the other note, yet I think he did, in substance, demand it, considering that the situation, as it was changed by the production of these notes, was a surprise to him and to his son, and that they were without counsel. On that part of the case I have no difficulty, but the value of the note as a security against the executors raises a more serious question. If the note was given for a valuable consideration, it was, of course, a valid security without regard to the actual sealing of it. But I have already found, as a matter of fact, that it had no moneyed consideration, but was intended as a gift. If so, by the plainest principles, it cannot, as between strangers, be enforced unless it is treated as a sealed instrument, and equity cannot, in such case, apply its reformatory powers and add a seal unless there be a valuable, as distinguished from a mere meritorious, consideration.

The complainant claims, in the first place, that it is in effect a sealed note and should be treated as such; and, failing in that, second, that having been given to a daughter by a father, who had made a like gift to his other daughters, the duty to provide for his children is a sufficient consideration.

With regard to the seal, the courts in modern times have gone a long way in holding, on very slight grounds, that documents which bore on their face the intention of the parties that they should be sealed, were actually sealed, though not so appearing on their face.

In our own state, as early as 1823, in the case of *Force* v. *Craig, 2 Halst. 272,* in an action at law in which the declaration

was based upon the liability of the defendant as endorser upon
a sealed bill, the note produced, like that in this case, closed with
the words, "Witness my hand and seal," and was signed "John
Brown," with an ordinary pen flourish under the name, and no
other indication of a seal or scroll appeared. Justice Ford
charged the jury that they were bound to treat the flourish under
the name as a scroll put there by way of a seal, and that charge
was sustained by the court of errors and appeals.

In *Corrigan* v. *Trenton and Delaware Falls Co.*, *1 Halst. Ch.*
*52*, it was held that an impression made upon paper alone, with-
out any wax or substance capable of receiving an impression, was
a sufficient sealing by a corporation.

Lord St. Leonards, in volume 1 of his treatise on Powers,
*282, *283, says:

"But it is not necessary that an *impression* should be made with wax or with
a wafer. If the seal, stick or other instrument used *be impressed by the party on
the plain parchment or paper, with an intent to seal it,* it is clearly sufficient; and,
therefore, where the instrument is a deed, and on proper stamps, and it is
*stated in the attestation to have been sealed* and delivered in the presence of the
witnesses, it will, in the absence of evidence to the contrary, *be presumed to
have been sealed, although no impression appear on the parchment or paper.* This,
I am told, Lord Eldon decided when in the common pleas. But in Sprange
and Barnard (*2 Bro. Ch. *585*), Lord Kenyon rested his decision on the single
circumstance of the instrument being upon stamps."

This passage has become famous by being cited on numerous
occasions by the courts and text-writers in dealing with the
question now in hand, and was relied upon by the court of com-
mon pleas of England in *Re Sarah Jane Sandilands et al.*, *L.
R.* (*6 Com. Pl.*) *411* (*1871*). In that case, a deed of conveyance
of land in England had been sent to Melbourne, Australia, to be
there executed before a special commission issued out of the
English court, and when sent out it had pieces of green ribbon
attached to the places where the seals should be for the purpose
of receiving and holding the seals, but nothing capable of receiv-
ing an impression, and when returned executed by the several
parties it was in the same condition. In the attestation clause,
and in the acknowledgment before the commissioner, it was
stated to have been "signed, sealed and delivered." The ques-

tion was whether or not the deed was sealed, and the court held
that it was, and that the ribbon attached to the parchment for
the purpose of receiving the impression of the seals might stand
for the seals themselves.

In *Reg.* v. *The Inhabitants of St. Paul's, 9 Jur. 442 (1845)*,
the court of king's bench of England held that orders of
removal, required by statute to be made under the hands and
seals of justices, were good if made on paper with a representa-
tion of a seal printed upon them.   Now, I think that it would
be no great stretch of reasoning to hold that where the maker of
a note has said, in his own handwriting, as Mr. Brown did in
this case, " witness my hand and seal," and when he has taken
the trouble to call in his neighbor to witness it, it might well be
presumed that he did, in fact, as suggested by Lord St. Leon-
ards, place some object on the paper and press it by way of per-
formance of his declaration contained in the note, although, at
this time, the paper shows no marks of it.   I think it would not
be any greater stretch of judicial imagination to so hold than it
was, in *Force* v. *Craig,* to hold that an ordinary flourish, made
by a pen under the name, should be treated as a scroll, or, in the
English case, that a ribbon attached to a deed for the purpose of
receiving the seals should be treated as actual seals.

The whole value at this day of the sealing of an instrument
containing a contract affecting personal property is to show that
it was executed with such solemnity as to dispense with the neces-
sity for proving the consideration.   *Aller* v. *Aller, 11 Vr. 446.*

This doctrine had its origin in the practice which arose in the
middle ages of the great and wealthy, but illiterate, barons and
landowners carrying seals, with devices upon them peculiar to
each owner, which were known, and which were used with much
formality and expenditure of time and care for making impres-
sions upon heated wax attached to contracts and conveyances.
But the use of wax and the peculiar devices, coats-of-arms,
crests, and the like, soon passed away, and the use of an ordi-
nary corrugated stamp upon a wafer covered by a piece of paper
took its place, and then came, by statute in this state, a mere
scroll.   Thus the seal came to be looked upon as a mere mode

by which the party executing the paper was enabled to declare that it should be binding without regard to the consideration.

Now, if the party has deliberately declared that the instrument is sealed, it seems to me that it should have the same force and effect in that respect as if the scroll or actual seal was there placed.

But I do not find it necessary to determine this question, because I think, upon the other ground taken by the complainant, he is entitled to succeed.

While courts of equity will not aid a mere volunteer or stranger in a case like this, an exception has always existed in favor of children.    *Story Eq. Jur.* §§ *166, 168, 169, 170.*

" If," says the learned author (section 169), " there be a defective execution, or attempt at execution, of a mere power, there equity will interpose and supply the defect, not universally, indeed, but in favor of parties for whom the person entrusted with the execution of the power is under a moral or legal obligation to provide by an execution of the power. Thus, such a defective execution will be aided in favor of persons standing upon a valuable or a meritorious consideration, such as a *bona fide* purchaser for a valuable consideration, a creditor, a wife and a *legitimate child."*

And in section 170 :

" When the party undertakes to execute a power, but, by mistake, does it imperfectly, equity will interpose to carry his very intention into effect, and that, too, in aid of those who are peculiarly within its protective favor—that is, creditors, purchasers, wives *and children."*

Professor Pomeroy (*2 Pom. Eq. Jur.* § *588*) uses this language :

"All agreements, so far as the binding efficacy of their promises is concerned, must be referred to one or the other of three *causes* – a valuable consideration, a mere voluntary bounty, or the *performance of a moral duty.* The first alone is binding at law, and enables the promisee to enforce the obligation against the promisor. The second, while the promise is executory, is a mere nullity, both at law and in equity. The third constitutes the meritorious or imperfect consideration of equity, and is recognized as effective by it within very narrow limits, although not at all by the law. While this species of consideration does not render an agreement enforceable against the promisor himself, nor against any one in whose favor he has altered his original intention, yet if an intended gift based upon such meritorious consideration has been partially and *imperfectly* executed or carried into effect by the donor, and if his original intention remains unaltered at his death, then equity will, within certain nar-

row limits, enforce the promise thus imperfectly performed, as against a third person claiming merely by operation of law, who has no equally meritorious foundation for his claim.   The equity thus described as based upon a meritorious consideration only extends to cases involving the duties either of charity, of paying creditors, or of maintaining a wife *and children.*"

In *Smith* v. *Ashton, 3 Salk. 277,* a father being seized of lands in fee, settled the same to the use of himself for life, remainder to his eldest son in tail, with a power by his last will, under hand and *seal,* to charge it with £500.   Afterwards, by his will in writing, but *not sealed,* he charged it with £500 for his younger children.   Upon a bill exhibited against the heir there was a decree for the money, though it was objected that the settlement was wholly voluntary.

"But (per curiam) the power is well executed, for the substantial part of it is to do the thing, and the neglect of a circumstance shall not avoid it in a court of equity; and the rather because such powers are not like conditions— strictly to be expounded—but favorably to be construed for the *benefit of children.*"

See another aspect of the same case in *1 Ch. Cas. 264,* and *Freem. Ch. 308.*

And in *Fothergill* v. *Fothergill, Freem. Ch. 256,* it was held by the master of the rolls that whenever a conveyance was made upon a good consideration, if there be any defect in the execution, that this court hath always supplied the defect; as in the case of a feoffment, to supply the defect of livery; in devises of a copyhold, to supply the defect of a surrender; and it was further held that payment of debts, provision for a wife *and children,* marriage or purchase, were considerations for which this court had supplied such defects.

In *Thompson* v. *Attfeild, 1 Vern. 40,* it was said that "generally a defect in a voluntary conveyance would not be supplied and made good here, yet if a man voluntarily makes a settlement as a provision *for his children* and for their maintenance, such a voluntary conveyance shall be supplied and made good here."

And in *Hervey* v. *Hervey, 1 Atk. 561* (at *p. 563*), Lord Hardwicke said: "It has been rightly observed by the bar that a

court of equity will supply a defective execution of powers as well in the case of *younger children* and a provision for a wife as in favor of purchasers or creditors."

It is true that the exercise of this jurisdiction of a court of equity has been generally confined to cases of the defective execution of a power, or to supply the surrender of a copyhold estate; but where that power has been exercised upon the sole consideration of the parental duty to provide for a child, the principle upon which the court has acted has been that the duty which the parent has to provide for his child is a sufficient consideration, or, as it has been termed, a " meritorious " consideration, which a court of equity recognizes as *good* as distinguished from valuable; and I am unable to perceive any reason why this underlying principle should not be applied in the case of a sealed bill or bond given to a child.

In the numerous cases found in the books where the courts have supplied the defective execution of powers, the question always has been whether the *intent* on the part of the donee of the power to execute it was sufficiently manifested in writing. Here the intent of Stephen Brown to make an effective gift to his daughter of $1,000, by means of a sealed bill, is thoroughly shown by his own handwriting, and all the circumstances necessary to call into exercise the jurisdiction of the court are present. The testator had five daughters, and, for reasons satisfactory to himself, he thought fit to make to each a present of $1,000 over and above the amount which they were to receive under his will. He executed and delivered to each a writing, which would enable each to receive that sum of money from his executors. He died without having changed his mind with regard to it. · The validity of these writings has been recognized by the executors in the case of each of the daughters except Anne Conover, and the money has either been paid or secured to each of them. Equity requires that Anne Conover should receive the same treatment. In fact, no defence was made to the note on the ground that it was not sealed, but it was put on the ground, which I have already disposed of, that it was not to be delivered to her, unless she gave up the McCord bond and mortgage. The real ground

Conover *v.* Brown.

·upon which the sisters, Sarah and Julia, who were sworn on the part of the defence, put the case, was that Mrs. Conover had, in her lifetime and after the death of her father, frequently declared ·to them that she did not wish any of her estate to go to her husband, but wished it to go back to the estate, and these witnesses manifested a strong feeling on the subject. But this court cannot ·take notice of such declarations of Mrs. Conover. In point of ˙ fact, she never exercised her right to make a will, and it may well be doubted whether those wishes so expressed to her sisters ·were those of her death-bed.

The supplying the want of a seal in ordinary cases is a very ·common exercise of the jurisdiction of the court. *Wadsworth* v. *Wendell, 5 Johns. Ch. 224 ; The Inhabitants of Montville* v. *Haughton, 7 Conn. 543; The Inhabitants of the Township of Bernards* v. *Stebbins, 109 U. S. 341.*

For these reasons, I conclude that the $1,000 note must be treated in all respects as if the maker had actually affixed a seal ·or a scroll thereto, and that the complainant is entitled, as to it, to relief accordingly.

The prayer of the bill is that the executors may deliver over to the complainant the $2,210 mortgage, and that the defendants may be decreed to pay to the complainant the amount due on ·any promissory notes or sealed bills, with the usual prayer for ·other relief. I think that the simple way to administer the complainant's equity is to apply the amount due on the two promis·sory notes to the amount due on the mortgage.

By a statement made up at the interview of December 25th, 1886, and put in evidence, it appears that there had been $374.30 paid on account of interest on the mortgage. There was no contention that anything had been paid on account of the two notes. After giving credit for $374.30 as payment of interest on account of the mortgage, I make the amount due on it, on De·cember 25th, 1886, as $2,805.24, and as due on the two notes, $2,863, which would leave a balance due to the complainant of $57.76. If these data are correct, complainant is entitled to a decree for that amount, with interest from December 26th, 1886, and that the mortgage be delivered up and canceled of record.